1BNLMARC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    PATRICIA A. MARTONE,

4                    Plaintiff,

5              v.                          11 CV 1990 (JGK)

6    ROPES & GRAY LLP,

7                    Defendant.

8    ------------------------------x
                                         New York, N.Y.
9                                        November 23, 2011
                                         3:26 p.m.
10
     Before:
11
                         HON. JOHN G. KOELTL,
12
                                         District Judge
13
                             APPEARANCES
14
     VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C.
15        Attorneys for Plaintiff
     BY:  ANNE C. VLADECK
16        JEREMIAH J. IADEVAIA

17   PROSKAUER ROSE LLP
          Attorneys for Defendant
18   BY:  EDWARD BRILL
          LLOYD B. CHINN
19        BETTINA BARASCH PLEVAN

20

21

22

23

24

25

1BNLMARC

```
 1        (Case called; in open court)
 2        THE COURT:  Good afternoon all.
 3        This is a motion to compel by the plaintiff, and I've
 4   read the papers.  I'm familiar with the arguments.  I'm
 5   prepared to listen to anything you'd like to tell me in
 6   connection with the motion.
 7        Ms. Vladeck.
 8        MS. VLADECK:  Your Honor, just a few things that I
 9   think have occurred in discovery that may bear on the motion
10   that were after the submissions.  Some of the documents that
11   are part of the partial privilege log we received have been
12   used in depositions and the like, which we believe adds to the
13   waiver argument.
14        Moreover, Ropes & Gray in its papers refers to the
15   investigation several times as an independent investigation.
16   One of the things we also learned from the partial privilege
17   log was that a draft investigation report was submitted to
18   Ropes & Gray, and two weeks later the actual investigation
19   report was issued after apparently a fair amount of input from
20   the non-acting-as-lawyer partners, including Mr. Malt.
21        The other final thing with respect to the
22   investigation and plaintiff's ability to challenge it is a sham
23   is that during the depositions thus far, the executive coach
24   that was hired by Ropes & Gray to deal with some of the
25   management and personnel issues referred to the fact that he
```

1BNLMARC

1    and Mr. Malt, who I think is the decision-maker in this case

2    although we're not yet sure, used as a shorthand the phrase

3    "cover story," which was a message to give that might not have

4    been the right message.  For example, if certain action was

5    going to be taken against Ms. Martone, to have it come from the

6    coach as opposed to Mr. Malt.  In addition --

7              THE COURT:  What do you mean by executive coach?

8              MS. VLADECK:  Ropes & Gray hired an individual who was

9    considered an executive coach to work with partners at Ropes &

10   Gray who were having issues.

11             THE COURT:  Oh.

12             MS. VLADECK:  And that particular coach has now been

13   made a full employee of Ropes & Gray, and he referred to the

14   use of cover story as a shorthand for him and Mr. Malt in how

15   to message something.

16             In addition, Ms. Martone brought in a far amount of

17   business during the time the investigation was going on.  There

18   was a memo that said essentially how do we come up with a story

19   so that this isn't the only business that was brought in so

20   that we can message it with other business brought in by other

21   partners.

22             THE COURT:  That doesn't necessarily go to the

23   production of the report or the backup for the report.

24             MS. VLADECK:  Well, it does in that it was during the

25   time of the investigation.  There's a question really not only

1BNLMARC

1    of the investigation and the privilege issues before your Honor

2    going to the retaliation claim, but how the investigation was

3    conducted both internally and externally.  Also goes to pretext

4    on the discrimination claim, so that really was the argument.

5          THE COURT:  That seems to be a separate issue from the

6    report itself.  I mean it goes to the underlying claim of

7    discrimination or retaliation, notions of how do we come up

8    with an explanation, how do we come up with a story.  If in

9    fact any of that occurred would be an issue irrespective of the

10   production of the report and what went into the report, unless

11   those comments were directly related to the existence of the

12   investigation of the report.

13         MS. VLADECK:  I understand, your Honor.  My only point

14   on this is that one of their arguments with respect to why the

15   privilege should be found and found not waived is that it was

16   an independent investigation, and my point is that there's a

17   real question as to the independence of the investigation.  But

18   I understand your Honor's point and with that I will sit down.

19         THE COURT:  All right.

20         Defendants.

21         MR. CHINN:  Your Honor, I'll be very brief and then I

22   will try, in a few sentences, try to address what Ms. Vladeck

23   just referred to.

24         So as we explain in our papers, and I won't go into

25   detail, we think the first question here is:  Does Ropes & Gray

1BNLMARC

1    rely on advice of counsel as a defense here?  And we think the

2    answer to that is no.

3         We think there's a second question though that is a

4    more complicated one and that is:  Is there an assertion of

5    fact by Ropes & Gray that to be fair should permit access to

6    privileged material for the purpose of rebutting that assertion

7    of fact?  And I think as we have clarified the offer that we

8    made in our briefing on the issue, we have recognized that it's

9    at least arguable.  We're willing to concede for the purpose of

10   this debate that to examine the statement by Mr. Malt during

11   the meeting with Ms. Martone that an investigation had been

12   completed and had determined that discrimination was not the

13   cause of the decline of Ms. Martone's practice and that there

14   were other plausible factors that did explain that decline in

15   practice, we think that that raises the question.

16        Okay, that's an assertion of fact.  It's not an

17   attempt to rely on advice of counsel as a legal defense, but

18   it's a factual statement that perhaps Ms. Martone is entitled

19   to plumb to some degree.  What would Martone need in fairness

20   to her -- and that's the word that's repeatedly used in these

21   cases -- to plumb that assertion?

22        And we would submit, as we have stated in our papers,

23   that the report's conclusions would be appropriate to produce

24   to Ms. Martone for that purpose so that she can determine

25   whether Mr. Malt was telling the truth when he made that

1BNLMARC

1   statement.

2          THE COURT:  If it's going to be fair, at the trial

3   before the jury in the case, Ropes & Gray will put on

4   testimony, as you say in your papers and as you've said now,

5   that they hired a distinguished, large law firm to conduct an

6   investigation, and the conclusion of the investigation was no

7   discrimination.  The conclusion of the investigation, if

8   accepted by the jury, would defeat the plaintiff's first claim

9   of discrimination.  A distinguished, independent, allegedly

10  independent, large law firm has said that there was no

11  discrimination.

12          And you say, well, it's enough simply to find out

13  whether Mr. Malt was telling the truth that that was what

14  O'Melveny said because if they said it, then he obviously was

15  able to rely on it for making his decisions and it's of no

16  moment that the investigation may have been shoddy or biased or

17  didn't look at all of the information because it reached a

18  conclusion and he was telling the truth that this was the

19  conclusion it reached.

20          That doesn't seem fair if Ropes & Gray is able to put

21  before the jury, as it realistically has to -- that's part of

22  the conversation; that's what it did -- it doesn't seem fair

23  not to let the plaintiff at least say that conclusion was

24  wrong.  Here's why it was wrong.  And not only in the sense of

25  what the parties will be arguing out, which is was there

1BNLMARC

```
 1    discrimination or wasn't there.  I fully understand your
 2    position.  That's going to be the issue.
 3          And you say, well, all of these people are going to
 4    testify to personal knowledge, was there or was there not
 5    discrimination.  But, in addition to that, there's going to be
 6    this other helper, this big investigation.  And you say the
 7    only thing that has to be done is to determine whether that was
 8    really the conclusion.  So, here, take the report.  See, that
 9    was their conclusion.  And so at the trial, you're going to
10    have a conclusion of a distinguished law firm that there was no
11    discrimination, and you say the plaintiff should not be able to
12    go behind that.
13          MR. CHINN:  Well, I would say the plaintiff through
14    the discovery, the substantial discovery that's occurring in
15    this case, will very much be able to go behind that.  In other
16    words, the plaintiff will be able to say, you know, Ropes &
17    Gray's conclusion, whatever it was based on that I wasn't
18    discriminated on, was incorrect and I'll tell you why.
19          THE COURT:  You mean O'Melveny's conclusion, right?
20          MR. CHINN:  Well, Ropes & Gray and O'Melveny's
21    conclusion.  In other words, Ropes & Gray, I mean I did mean to
22    say Ropes & Gray, but Ropes & Gray based on the information it
23    received from O'Melveny, which I believe when Mr. Malt
24    testifies and Mr. Montgomery testifies it will be described as
25    confirmatory in nature, will say this was our conclusion and we
```

1BNLMARC

1    were helped in reaching this conclusion by an outside source.

2         But, you know, we're going to put on -- Ms. Martone

3    will put on a case of why she thinks that the evidence relied

4    on, the objective data, the testimony about her interactions

5    with other partners, she will put or at least has had the

6    opportunity to take substantial and ongoing discovery about the

7    bona fides there.

8         And Ropes & Gray will not say to the jury, you know,

9    look, forget about the underlying facts, we didn't discriminate

10   against her because somebody said so.  This is really more of a

11   timing issue, your Honor.  And, frankly, in plaintiff's papers,

12   they're more focused on the retaliation claim, which I think is

13   interesting here, than they are on the discrimination claim

14   because that's really the context in which this comes up.  We

15   disagree about the way in which it comes up in the context of

16   the retaliation claim.

17        THE COURT:  It really comes up in both contexts though

18   because you can't unring the bell with respect to the

19   underlying claim of discrimination because you have a report

20   that says no discrimination.  I realize that the plaintiff in

21   the plaintiff's papers on the current motion places more stress

22   on the issue of retaliation because retaliation is a subjective

23   claim.  So, what was in the minds of the Ropes & Gray people

24   when they made their decision is very much at issue, and so

25   there's a distinction between Erie and objective considerations

1BNLMARC

1   and retaliation and subjective consideration.  You know, I get

2   that.  There's still the other part.

3           And you say both parties will argue out the ultimate

4   merits of whether there was or was not discrimination.  But,

5   the jury will still hear that there was this independent

6   investigation which Ropes & Gray went to the trouble and

7   expense of getting done in order to assure itself that there

8   was no merit to these claims; and this independent

9   investigation concluded that there was no merit to these claims

10  and so it was able to go forward with its previously determined

11  position to fire the plaintiff, to terminate the plaintiff.

12  And so Ropes & Gray will have the oath helper, so to speak, of

13  this independent investigation.

14          MR. CHINN:  Well, I agree with what you've just

15  described in terms of Ropes & Gray's what I would call

16  extrajudicial use of this information, that is, Ropes & Gray

17  was on this path of asking Ms. Martone to leave and, while on

18  this path, essentially this path was interrupted by a very

19  serious assertion.  Ropes & Gray felt that it had to interrupt,

20  essentially, the direction in which it was going and examine

21  that assertion, and it did so in the way you just described.

22          But, as I've said before, I don't believe it is Ropes

23  & Gray's intent to say to the jury -- I mean in some sense it's

24  like a hearsay analysis, right.  We're not offering the report

25  to prove there was no discrimination.  We're offering the

1BNLMARC

1    report more for the purpose of saying, look, we were on this

2    path, we were going to do this or at least we were moving in

3    this direction, and we stopped for this period of time in 2010.

4    When that came to a conclusion and we received the result that

5    we received from O'Melveny & Myers, we then proceeded onward.

6    And I think that's the fashion in which it has been both

7    pleaded by the plaintiff and answered by Ropes & Gray in this

8    case.

9            I think what you're asking is, but aren't you going to

10   try at trial to bolster, to sort of say but you can really

11   trust us on this one because there's this other law firm and

12   our trial strategy is to say we were right about the

13   discrimination because we had a third party, a neutral third

14   party conclude in that fashion.

15           As I've said, I think it's our intent to prove the

16   existence of a legitimate or a legitimate nondiscriminatory

17   bases for our reasons by reference to the evidence of those

18   nondiscriminatory legitimate bases.  Ms. Martone, of course,

19   will be free to assert they are pretextual and there is in fact

20   evidence of discrimination.  We don't believe that to be the

21   case, but that's what the litigation is for.

22           With respect to the retaliation claim, I mean I think

23   it's important, there were no retaliation claims advanced or

24   that was not the subject of the report that was done by

25   O'Melveny.

1BNLMARC

1    THE COURT:  Right, because there had been no adverse

2    action taken yet.

3    MR. CHINN:  Exactly.  There's no attempt -- well, I

4    think Ms. Martone might disagree with what you just said.

5    THE COURT:  Right, her work was being cut back, so.

6    MR. CHINN:  I don't think there's any claim that there

7    was an earlier complaint of discrimination that could have

8    prompted those earlier actions that Ms. Martone is complaining

9    of.  So, then I don't think there's any dispute.  The subject

10   of retaliation was not what O'Melveny & Myers was hired to

11   examine and they didn't.  And there was no statement by

12   Mr. Malt regarding retaliation to Ms. Martone in the meeting

13   we've talked about.

14   And in fact, frankly, from a business perspective it

15   was important to O'Melveny & Myers to examine this question,

16   but from a legal perspective Ms. Martone does not have to prove

17   the bona fides of her discrimination claim to prevail on her

18   retaliation claim.

19   THE COURT:  Just needs a good faith belief.

20   MR. CHINN:  She just has to actually have complained

21   and have a good faith belief with respect to that complaint.

22   Her June 10 memorandum says what it says.  There's nothing we

23   can do to run away from that memorandum.  She accuses the firm

24   of discrimination there.

25   But at the end of the day, whether her discrimination

1BNLMARC

1    complaint was a valid one or not a valid one will not in any

2    way be determined by a report received from O'Melveny about the

3    underlying discrimination claims.  That's not -- she doesn't

4    have that burden nor do we.

5         THE COURT:  Of course, if the report was really not a

6    good report, if it were in any way slanted, biased, not

7    independent, then she could make an argument that the report

8    was in fact pretext and that the people who received the report

9    really had every reason not to believe it.  And when they say

10   that they terminated her for completely nondiscriminatory

11   reasons and they had the report that eliminated any claim of

12   discrimination, if the report was not a good, independent,

13   unbiased report, they would have an argument that would support

14   their argument of pretext for retaliation, a subjective state

15   of mind.

16        MR. CHINN:  Your Honor.

17        THE COURT:  I'm not saying, obviously, I'm not

18   impugning the O'Melveny report at all.  I have no basis to do

19   that.  The only issue is whether the plaintiff should have an

20   opportunity to, as the cases say, plumb the validity of the

21   report and plumb what the people who got it thought of it, knew

22   about it, how did they participate in it.

23        But you touch on an important issue which is really

24   not developed much in the papers which is the scope of possible

25   discovery relating to the report and what went into the report.

1BNLMARC

1   And I realize that the papers were produced promptly over time.

2   They were produced, for example, before a privilege log had

3   been produced, which now has been produced.

4          And it would be, and I'll talk to you more about this

5   later, but it would be wrong to promote a trial within a trial

6   with respect to the O'Melveny report, depending upon how it's

7   used.  And if it's not going to be turned into a trial within a

8   trial on the O'Melveny report, then, you know, discovery should

9   be proportional to what it is that's being sought and what the

10  importance of that is to the case.

11         And in your papers you really effectively say that

12  you're prepared to give some discovery with respect to the

13  O'Melveny report, such as the O'Melveny report itself, but you

14  draw a line at letting the plaintiff have sufficient

15  information in order to discredit the report.  And you say now

16  that, you know, you're willing to look at the report much like

17  hearsay, not being admitted for the truth.

18         Of course, that argument is not made in the papers,

19  but it's also hard to see what the instruction would be with

20  respect to the O'Melveny report that would be an adequate

21  instruction because Ropes & Gray comes into this motion

22  wanting, wanting the good parts of the report, wanting the jury

23  to appreciate that it went the last mile.  It wasn't enough for

24  Ropes & Gray simply to investigate the allegations itself and

25  conclude no discrimination.  It hired an outside firm to

1BNLMARC

1    conclude no discrimination.  It waited to make its final

2    decision until that report was issued.  That leaves open -- you

3    say, oh, at trial, we're not going to try to say believe the

4    O'Melveny report.  The way in which you described what you're

5    going to say at trial makes the O'Melveny report fairly

6    important.

7           Now, I believe that the federal rules mean what they

8    say with respect to proportionality, and I don't think that the

9    O'Melveny report should begin an entire new litigation.  But,

10   in fairness, the plaintiff should have some opportunity to be

11   able to respond proportionately to the O'Melveny report.  Of

12   course, I'll decide the motion in a few moments.  I want to

13   make sure I understand everything that you have to tell me.

14           MR. CHINN:  Well, in the plaintiff's initial moving

15   papers the plaintiff seeks, although it's I think just listed

16   as four categories in the way it's described at pages one or

17   two or three at the very beginning of their moving brief, but I

18   count more like nine categories of document discovery before we

19   get to depositions that are being sought here.

20           The first is the investigation report itself.  Of

21   course, as you know, we've distinguished the conclusions from

22   the facts and we've relied on a number of cases including the

23   Bruss case for that sort of distinction, but that's one item.

24           The second item that were separately produced by

25   O'Melveny is an executive summary of the report.  You know, at

1BNLMARC

1    the end of the day I don't know that there's a great deal of

2    dispute with respect to the conclusions from our perspective in

3    the investigative report itself or in the executive summary,

4    which I think are very similar.

5           Then the next category is drafts of the investigation

6    report.  Ms. Vladeck noted that there was a draft of the

7    investigative report provided to O'Melveny and then it was,

8    quote, finalized -- I'm sorry, to Ropes -- and it was finalized

9    a few weeks later and that presumably there was a lot of input

10   into its content in between those two points in time from Ropes

11   to O'Melveny.  And I don't think there's any indication of that

12   whatsoever on the privilege log, in other words, that there was

13   some kind of, you know, extensive communications or drafts or

14   what have you that went from Ropes back to O'Melveny of this.

15   And we would maintain our objection to producing that, those

16   drafts.  I think the executive summary, I think, piece actually

17   went through more drafts than the actual investigation report

18   itself.

19          Communications regarding the drafts, I mean there are

20   communications between O'Melveny and its client, Ropes & Gray.

21   There are communications within Ropes & Gray among its

22   management and its in-house counsel regarding the report.  We

23   don't believe that just because the report is -- there are

24   facts about this report have been put into issue to some degree

25   here.  We do not believe that results in a waiver of all the

1BNLMARC

1    communications with respect to all the communications about the

2    report or about the investigation.  Communications between

3    O'Melveny & Myers and Ropes regarding the investigation, I mean

4    there are different -- I mean some of the communications

5    between O'Melveny and Ropes & Gray are fairly -- I should say,

6    looking for the word -- administrative or logistical in nature.

7    But some of them may well constitute legal advice or opinion,

8    work product, and we would take the view that those should not

9    be divulged.

10          The pre-investigation communications between outside

11   counsel and defendant, another category they're seeking.  I

12   mean there's a retention letter.  We think that's a privileged

13   document.  We would object to that.

14          O'Melveny's notes regarding the investigation, those

15   are not in Ropes & Gray's actual custody and control.  While

16   Ms. Martone might argue -- and this really didn't get fleshed

17   out in the papers -- that we could instruct O'Melveny in that

18   regard, I think that the law in New York on that in Stage

19   Realty v. Proskauer, their notes are actually theirs.  They're

20   not ours.  And, again, we would oppose the production of those.

21          Documents in Ms. Patrick's custody or control relating

22   to the discrimination complaint and investigation, there are a

23   few categories here.  One category has been produced in full to

24   Ms. Martone.  Ms. Patrick had a number of communications

25   directly with Ms. Martone.  All of those have been produced.

1BNLMARC

1          Another category though is Ms. Patrick's

2     communications with O'Melveny, which I've already alluded to.

3     We believe those, many of those are privileged communications

4     and constitute, at least some may constitute opinion, work

5     product.  Some will be more administrative in nature, like I

6     said.  But, more importantly, Ms. Patrick had internal

7     communications within Ropes & Gray, as she set forth in her

8     declaration, in which she functioned as counsel to the firm.

9     She rendered advice on how the investigation should be

10    conducted, in terms of who should conduct it.  She rendered

11    advice in terms of issues that came up during the course of the

12    investigation and how they should be addressed.

13          And, finally, the last category of documents sought is

14    documents in the possession, custody or control of Mr. Mendel,

15    who there is no dispute between the parties -- there is some

16    attempt to attack whether Ms. Patrick acted in a business

17    capacity by Ms. Martone, but there is no dispute that

18    Mr. Mendel serves on as a regular basis as in-house counsel for

19    employment and employment-type issues to the firm.  And we

20    don't believe there's been any showing by the plaintiff that

21    would require his communication on this subject to be produced.

22          So I don't mean to go on at length here, but those

23    were the categories when you break them into items that were

24    sought by the plaintiff.  And while I understand what you've

25    said, your Honor, and while we understand the cases that there

1BNLMARC

1    has to be some level of fairness here, we believe that many of

2    these categories go well beyond what fairness would require in

3    this regard.

4              And, in closing, I just wanted to go back to something

5    you said a moment ago.  I hear that you seem dubious of the

6    proposition that Ropes & Gray intends to prove its legitimate

7    nondiscriminatory basis for action here based on the facts.

8              THE COURT:  Oh, no, I don't doubt that.  No, no.  I

9    mean I don't for a moment doubt that Ropes & Gray would give up

10   its opportunity to prove at trial that there was no

11   discrimination and that Ropes & Gray would attempt to do that

12   on the underlying evidence that Ropes & Gray contends shows no

13   discrimination.

14             What I said was Ropes & Gray does not forswear the

15   ability to have the good parts of the investigation there

16   before the jury.  In fact, it's integrally related with the

17   position of Ropes & Gray as expressed in the papers and at

18   argument.  Ropes & Gray uses the investigation to bolster its

19   position and does it in a way which, you know, I'm not

20   faulting.  Ropes & Gray says here's what happened.  We had an

21   independent investigation and we wouldn't act before we had an

22   independent investigation tell us that there was no

23   discrimination.  And when we heard that there was no

24   discrimination, based upon this investigation by a

25   distinguished outside firm, we could then proceed.  We could

1BNLMARC

1    proceed to terminate the plaintiff.  And we were not

2    retaliating against her from the allegations that were out

3    there and caused the investigation, but --

4         MR. CHINN:  Your Honor, with all due respect, I think

5    that, look, I can certainly hear everything you're saying up to

6    the final point.  I do think our emphasis is a bit different,

7    but I can understand how you would describe it that way.  But

8    that there was therefore no retaliation, I don't think

9    that's -- I mean the point of explaining the chronology is not

10   to say, we're not saying that that proves that there's an

11   absence of any retaliatory motive.  What we're saying is that

12   explains the timing of Ropes & Gray's actions.

13        In other words, we were heading down this path.  I

14   mean there were a lot of criticisms that had come to the

15   attention of the firm's management, a lot of concerns that had

16   been developing over some period of time.  Certain actions had

17   already been taken with respect to Ms. Martone in prior years.

18        THE COURT:  Let me just ask you this.  I've said I

19   don't have any information before me to impugn O'Melveny, a

20   large firm with a good reputation.  I have no information to

21   suggest that the report was anything other than a stellar piece

22   of work, but I doubt the plaintiff agrees with that.

23        The plaintiff's contention that there was

24   discrimination, of necessity, requires the plaintiff to say the

25   O'Melveny report was just wrong.  If the O'Melveny report was

1BNLMARC

1    wrong and if the people at Ropes & Gray who commissioned it

2    worked with the O'Melveny people in connection with the report,

3    had communications with them, reviewed drafts, if they came to

4    the conclusion that for whatever reason O'Melveny was coming up

5    with a conclusion that was not correct and they knew it, the

6    Ropes & Gray people -- I'm not suggesting this is right but

7    that's why we have discovery and why we have trials --

8    shouldn't the plaintiff at least be able to explore whether the

9    people at Ropes & Gray didn't believe the O'Melveny report and

10   that the O'Melveny report was in fact simply another piece that

11   they were using in a pretextual effort to hide the true reasons

12   for the termination?

13          Again, I have two sides before me.  I have the

14   plaintiff; I have the defendant.  Of necessity you have

15   different conclusions about the O'Melveny report and whether

16   it's true.  It has to be, right?

17          MR. CHINN:  I think this is far more fundamental than

18   that, but I know you disagree with me and I don't mean to

19   repeat myself.  We have a disagreement as to the reason she was

20   asked to leave the firm, and that is the principal disagreement

21   here.  And if Ms. Martone disagrees with our conclusion, that

22   is, Ropes & Gray's conclusion that she was not discriminated

23   against and O'Melveny's conclusion that she was not

24   discriminated against, she has been given very significant

25   access to the evidence from which she can make the arguments to

1BNLMARC

1    persuade the jury that.

2              And that's really our position, your Honor, is the

3    case is really about the facts.  It's not about at the end of

4    the day what O'Melveny said.  From our perspective, we're not

5    relying on O'Melveny to say there was no -- there was an

6    absence of retaliatory animus.  It's really to say, look, this

7    is what we were doing and we stopped on that path and went on

8    to another one for a period of time.  It's factually what

9    happened, as you pointed out, and we spoke about this two

10   months ago, we can't get away from that.  It is what happened.

11   We can't sort of just make up facts to fill that in.

12             But at the end of the day, that is not going to be --

13   we're going to try this case.  We're going to litigate this

14   case based on what the objective data regarding Ms. Martone's

15   performance, what they were, what individuals said or believed

16   about Ms. Martone, other partners in the firm, and the way she

17   interacted with them.

18             And, you know, if Ms. Martone is cross-examining these

19   people or deposing them and will be able to cross-examine them

20   and say it was really your fault, not mine, that we had this

21   conflict, she's perfectly capable of doing these kinds of

22   things or attacking the data and saying this data doesn't take

23   into account my contributions in another way or what have you.

24   All the sorts of ways that one attacks and tries to prove

25   pretext, she can do all of that and have nothing to do with

1BNLMARC

1    what O'Melveny said at the end of the day.  And from our

2    perspective, it doesn't either.  And it is the story that we

3    hired a prestigious law firm to do this.  And to say what we're

4    going to do is come in here and say you can't find we

5    discriminated against because we looked into it and somebody

6    said we weren't.

7            And I mean I understand the fairness point, and that's

8    why we have come with a concession.  And maybe you will find

9    that the lines should be drawn somewhere else.  It certainly

10   sounds as if that's the case.  But I don't think at the end of

11   the day the categories that are being sought here, I think a

12   number of these categories -- and we haven't gotten to

13   depositions yet.  They just say we want to depose a bunch of

14   people about this.  I think that what they're seeking here goes

15   far beyond what would be necessary even to do precisely what

16   you're describing here.

17           THE COURT:  Okay.

18           MS. VLADECK:  Can I make just a few brief factual

19   points, your Honor.

20           One, we didn't get a full privilege log.  We just got

21   a privilege log from Diane Patrick.

22           Moreover, the time period from when Ropes & Gray

23   received the draft on September 23, 2010, to when it received

24   the final on October 6, there are numerous entries that include

25   emails from Malt, Montgomery, and McCabe, the two heads of the

1BNLMARC

1   firm and the head of the practice group.

2          And, finally, with respect to what was said, I think

3   it's just getting somewhat truncated, but Mr. Malt did not put

4   in an affidavit saying that anything Ms. Martone said was

5   erroneous.  And he makes it very clear that they had decided to

6   terminate her employment after reviewing the report, which

7   having the Patrick privilege log shows all occurred in the same

8   day.

9          THE COURT:  All right.  Let me decide the motion

10  that's before me and then we'll proceed with some discovery

11  issues.

12         The plaintiff, Patricia Martone, brings this motion to

13  compel the defendant, Ropes & Gray, to produce the report,

14  drafts, notes, and communications related to an investigation

15  conducted by outside counsel O'Melveny & Myers into the

16  plaintiff's claim that she was the victim of age and gender

17  discrimination.

18         The facts relevant to this motion are as follows.  The

19  plaintiff is a female attorney who was terminated from her

20  position as a partner at Ropes & Gray in 2010.  Ropes & Gray

21  will also be referred to as "the firm" or "the defendant."  At

22  the time of bringing this action, the plaintiff was 63 years

23  old.  The plaintiff alleges that the defendant discriminated

24  against her on the basis of age and gender by stripping her of

25  work-related responsibilities, which resulted in a decline in

1BNLMARC

1    her law practice.  The plaintiff also alleges that the

2    defendant terminated her in retaliation for complaining about

3    this discrimination.

4         In June 2010, the plaintiff complained about gender

5    discrimination by writing a letter to the chair of the firm, R.

6    Bradford Malt, and the managing partner of the firm, John

7    Montgomery, which asserted that the firm had discriminated

8    against her on the basis of age and gender.  (Martone

9    declaration paragraph 2.)  The plaintiff requested that the

10   firm conduct an investigation into her complaint and share the

11   results of the investigation with her.  The firm retained

12   outside counsel, the law firm of O'Melveny & Myers LLP, to

13   conduct an investigation into the plaintiff's complaint of

14   discrimination.  (Martone declaration paragraphs 3 and 4.)

15        In October 2010, Malt sent an email to the plaintiff

16   requesting a meeting with her.  When the plaintiff asked what

17   the purpose of the meeting was, Malt explained that it was

18   intended to follow up her complaint of discrimination.  At the

19   meeting, Malt and Montgomery fired the plaintiff.  According to

20   the plaintiff, they told her that the investigation had

21   concluded that the decline in the plaintiff's practice was not

22   a result of discrimination and could plausibly be attributed to

23   factors other than discrimination.  The plaintiff also asserts

24   that they told her that they only decided to fire her after

25   reviewing the investigation report prepared by O'Melveny, which

1BNLMARC

1   led them to conclude that the economics of the plaintiff's

2   practice were unsustainable.  The plaintiff requested a copy of

3   the investigation report and was told that obtaining a copy

4   might not be possible but that she should contact Diane

5   Patrick, the firm's partner responsible for diversity.

6   (Martone declaration paragraphs 8 through 10.)

7          In the plaintiff's first request for production of

8   documents, dated June 10, 2011, the plaintiff sought production

9   of the investigation report, as well as all drafts of the

10  report and communications and notes regarding these drafts and

11  the investigation, that are in the possession of the defendant.

12  The defendant has refused to produce these documents claiming

13  that they are protected by the attorney-client privilege and

14  the work product doctrine.  The plaintiff now moves to compel

15  production of these documents.

16         Federal Rule of Civil Procedure 26(b)(1) provides

17  that:  "Parties may obtain discovery regarding any

18  nonprivileged matter that is relevant to any party's claim or

19  defense...Relevant information need not be admissible at the

20  trial if the discovery appears to be reasonably calculated to

21  lead to the discovery of admissible evidence."  Federal Rule of

22  Civil Procedure 26(b)(1).  Neither party disputes that the

23  information sought by the plaintiff is relevant to this case.

24  However, the parties dispute whether the information in

25  question is protected by the attorney-client privilege or the

1BNLMARC

1  work product doctrine, whether any such privilege has been

2  waived, and the scope of any potential waiver.

3       The attorney-client privilege protects from disclosure

4  confidential communications between a client and attorney for

5  the purpose of obtaining or providing legal advice.  United

6  States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011).  The work

7  product doctrine provides qualified protection for materials

8  prepared by or at the behest of counsel in anticipation of

9  litigation or for trial.  In re Grand Jury Subpoena Dated

10  July 6, 2005, 510 F.3d 180, 183 (2d Cir. 2007).  For both the

11  attorney-client privilege and the work product doctrine, the

12  party seeking to shield the information bears the burden of

13  establishing that the privilege or the doctrine applies.  See

14  Mejia, 655 F.3d at 132, (attorney-client privilege); In re

15  Grand Jury Subpoenas Dated March 19, 2002, and August 2, 2002,

16  318 F.3d 379, 384 (2d Cir. 2003)(work product doctrine).

17       As an initial matter, the plaintiff asserts that the

18  defendant failed to meet its burden of establishing that the

19  documents in question are privileged or protected work product.

20  This argument was based largely on the fact that the defendant

21  had not yet produced a privilege log as required by Local Rule

22  26.2.  Subsequently, the defendant informed the Court by letter

23  dated October 18, 2011, that the privilege log had been

24  produced to the plaintiff.  The plaintiff now says that the

25  privilege log that was provided covered only the files of

1    Ms. Patrick.  There has been no development of this issue since

2    it was only raised at argument.  If the resolution of this

3    dispute turned solely on the applicability of the

4    attorney-client privilege and the work product doctrine, the

5    Court would refer the matter to the magistrate judge for an

6    examination of the privilege log and, as necessary, for the

7    underlying documents and for any further proceedings.  However,

8    this is unnecessary because, even if any such privilege

9    applies, the defendant has waived it by placing the results of

10   the investigation "at issue" in this litigation.

11        The attorney-client privilege and work product

12   doctrine may be waived when a party asserts a claim or defense

13   that places privileged communications "at issue" in the

14   litigation.  "At issue" waiver stems from the principle that

15   the "attorney-client privilege cannot at once be used as a

16   shield and a sword."  <u>United States v. Bilzerian</u>, 926 F.2d

17   1285, 1292 (2d Cir. 1991); <u>see also</u> <u>In re Von Bulow</u>, 828 F.2d

18   94, 103 (2d Cir. 1987).  "Thus, the privilege may implicitly be

19   waived when a defendant asserts a claim that in fairness

20   requires examination of protected communications," <u>Bilzerian</u>

21   926 F.2d at 1292, or "places a document in issue through some

22   affirmative act intended to inure to that party's benefit,"

23   <u>Granite Partners v. Bear, Stearns & Co., Inc.</u>, 184 F.R.D. 49,

24   55 (S.D.N.Y. 1999).

25        The Second Circuit Court of Appeals has recently

1BNLMARC

1   clarified that "at issue" waiver does not arise whenever a

2   party makes protected information "relevant to the case" but

3   rather only where that party "relies on privileged advice from

4   his counsel to make his claim or defense." In re County of

5   Erie, 546 F.3d 222, 229 (2d Cir. 2008).  The Court of Appeals

6   added:  "We decline to specify or speculate as to what degree

7   of reliance is required because petitioners here do not rely

8   upon the advice of counsel in the assertion of their defense in

9   this action." Id.  The work product doctrine may also be waived

10  when the protected document has been placed at issue.  See John

11  Doe Co. v. United States, 350 F.3d 299, 302 (2d Cir. 2003);

12  Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie. S.C.A.,

13  258 F.R.D. 95, 106-07 (S.D.N.Y. 2009).  The party asserting the

14  privilege has the burden of showing that it has not been

15  waived.  See Bank of America, N.A. v. Terra Nova Insurance

16  Company, 212 F.R.D. 166, 169 (S.D.N.Y. 2002).

17          Here, the defendant has taken or expressed its

18  intention to take several affirmative acts that place the

19  results of the investigation at issue.  First, it is undisputed

20  that the chair and managing partner of the firm told the

21  plaintiff that the investigation had found no basis for her

22  allegations of discrimination and then proceeded to terminate

23  her employment.  (Martone declaration paragraph 9 and 11.)

24  Second, the defendant asserts in its papers in connection with

25  this motion that if the investigation had revealed evidence of

1BNLMARC

discrimination, the defendant may not have terminated the

plaintiff.  (Defendant's memorandum at 6.)  Third, the

defendant referred to the investigation in its answer to the

plaintiff's amended complaint stating that the firm chair and

managing partner told the plaintiff "that the investigation

report from O'Melveny & Myers had concluded that the decline of

plaintiff's practice was not due to discrimination and could be

attributed to factors other than discrimination." (Answer to

amended complaint paragraph 99.)  Finally, in its motion

papers, the defendant makes clear that it plans to introduce

evidence relating to the investigation at trial.  In

particular, it intends to refer to the substance of the

conversation with the plaintiff upon her termination where she

was told that the investigation had concluded that no

discrimination occurred.  (Defendant's memo at 6-7.)

      Indeed, in the course of argument on the current

motion, defense counsel made it clear that the hiring of

O'Melveny & Myers and the receipt of the O'Melveny & Myers

report is part of the evidence that the defendant would

introduce at trial.  Indeed, it is difficult to see how the

defendant could not describe the investigative results at

trial.  The termination interview with the plaintiff is a

critical event in the evidence.  The defendant referred to the

results of the investigation to reject the plaintiff's claim of

discrimination at that interview, and the defendant has

1BNLMARC

1  conceded that this finding freed it to proceed with terminating

2  the plaintiff.  The defendant thus relied on the results of the

3  investigation in rejecting the plaintiff's claim of

4  discrimination which she is making in this case and intends to

5  refer to the results of the investigation at trial as part of

6  its explanation as to why it could terminate the plaintiff.

7          The defendant, however, argues that these actions do

8  not give rise to an at issue waiver because it is not relying

9  on a defense of advice of counsel and, indeed, advice of

10  counsel could not justify discrimination if it had in fact

11  occurred.  Nor, the defendant contends, is it relying on an

12  affirmative defense based on its conduct of a reasonable and

13  thorough internal investigation such as the Faragher/Ellerth

14  affirmative defense.  Instead, the defendant asserts as a

15  factual matter that no discrimination took place and that it

16  will establish this independently, without relying on the

17  results of the investigation.  The defendant thus contends that

18  this case should be distinguished from those cases imposing

19  waiver where a party formally invoked the advice of counsel

20  defense, see, for example, In re Buspirone Patent Litigation,

21  210 F.R.D. 43, 53 (S.D.N.Y. 2002), or where a party relied on

22  the Faragher/Ellerth affirmative defense, see, for example,

23  Angelone v. Xerox Corp., No. 09 Civ 6019, 2011 Westlaw 4473534

24  at *2-3 (W.D.N.Y. September 26, 2011), Pray v. New York City

25  Ballet Co., No. 96 Civ 5723, 1997 Westlaw 266980 at *1

1BNLMARC

1   (S.D.N.Y. May 19, 1997).

2              The defendant contends that this case is more

3   analogous to those where waiver was not imposed because the

4   party in question had not sufficiently relied on the advice of

5   counsel in asserting the claim or defense.  In particular, the

6   defendant points to the Court of Appeals' decision in In re

7   County of Erie, where the court held that a "mere indication of

8   a claim or defense certainly is insufficient to place legal

9   advice at issue" and that, instead, "a party must rely on

10  privileged advice from his counsel to make his claim or

11  defense." 546 F.3d at 229.  The defendant claims that because

12  it is not squarely invoking an advice of counsel defense or

13  raising a Faragher/Ellerth affirmative defense, it cannot be

14  said to have relied on privileged advice from counsel so as to

15  effect a waiver.

16             Yet, the case law does not define reliance as narrowly

17  as the defendant would suggest in its papers.  See, for

18  example, Bodega Investments, LLC v. United States, No. 08 Civ

19  4065, 2009 Westlaw 2634765 at *3 (S.D.N.Y. August 21,

20  2009)(privilege can be waived "irrespective of whether

21  plaintiff was invoking an advice-of-counsel argument");

22  Kingsway Financial Services, Inc., v. Pricewaterhouse-Coopers

23  LLP, No. 03 Civ 5560, 2008 Westlaw 5423316 at *11 (S.D.N.Y.

24  December 31, 2008)("Although waiver pursuant to the at issue

25  doctrine is most commonly found when a party asserts an advice

1    of counsel defense,...fairness considerations may also come

2    into play where the party asserting the privilege makes factual

3    assertions, the truthfulness of which may be assessed only by

4    an examination of the privileged communications or documents."

5    (internal quotation marks and citations omitted).  In Erie, the

6    Court of Appeals expressly declined to specify or speculate as

7    to what degree of reliance is required for waiver, given that

8    the petitioners in that case had relied only on a qualified

9    immunity defense, which, because it is an objective and not a

10   subjective test, rendered any legal advice...by counsel

11   irrelevant.  546 F.3d at 229.

12            Here, in contrast, the plaintiff's retaliation claim

13   requires an inquiry as to the subjective motivation and

14   underlying reasons the defendant possessed for its decision to

15   terminate the plaintiff.  In addition, the defendant has

16   admitted that it relied on the advice of counsel in making the

17   decision to terminate the plaintiff when it did, at least to

18   the extent that it may not have terminated the plaintiff had

19   its counsel's conclusions in the investigation been different.

20   This case thus presents a much closer nexus between the advice

21   of counsel and the claims and defenses at issue in the

22   litigation than did Erie.  See Bodega Investments, 2009 Westlaw

23   2634765 at *2  ("There is no question, unlike in Erie, that we

24   are required to determine a state of mind and also that the

25   state of mind was potentially influenced by advice rendered by

1BNLMARC

1    the attorney.  Hence, at issue waiver for such advice is

2    appropriately triggered, since access to that advice is vital

3    to assessing plaintiff's claim..." (internal quotation marks

4    omitted)).

5            Moreover, regardless of whether the defendant intends

6    to formally invoke an advice of counsel defense, the defendant

7    admits that testimony about the investigation's conclusions --

8    namely, that no discrimination occurred -- will be presented to

9    the jury at trial.  Indeed, it is difficult to imagine that the

10   substance of the conversation with the plaintiff informing her

11   of the investigation's conclusions that no discrimination had

12   occurred would not be introduced at trial.  Moreover, at

13   argument the defendant appears to concede that the history of

14   the investigation and the reasons for the investigation will be

15   part of the testimony of the Ropes & Gray witnesses at trial.

16   Thus, the existence of the investigation and its conclusions

17   which are favorable to the defendant and completely contrary to

18   the plaintiff's claim of discrimination will be before the jury

19   in this case.

20           This is precisely the type of situation where courts

21   have found that fairness compels waiver of the attorney-client

22   privilege and work product doctrine so that the opposing party

23   can challenge the conclusion of counsel by showing that it is

24   biased, incomplete, or unfounded.  As the Court of Appeals for

25   the Second Circuit has noted, "the unfairness courts have found

1BNLMARC

1   which justified imposing involuntary forfeiture generally

2   resulted from a party's advancing a claim to a court or a jury

3   while relying on its privilege to withhold from a litigation

4   adversary materials that the adversary might need to

5   effectively contest or impeach the claim." John Doe Co., 350

6   F.3d at 303; see also Business Integration Services, Inc. v.

7   AT&T Corp., No. 06 Civ 1863, 2008 Westlaw 318343 at *1,

8   (S.D.N.Y. February 4, 2008)("Based on considerations of

9   fairness, an at issue waiver can occur in situations where a

10  party makes assertions in litigation while relying on its

11  privilege to withhold...materials that an adversary might need

12  to effectively contest or impeach the claim."). In John Doe,

13  the Court of Appeals concluded that the defendant corporation

14  had not waived the privilege by sending a letter asserting its

15  good faith belief in the lawfulness of its conduct to a United

16  States Attorney. Id. at 306-07. The court distinguished that

17  situation where disclosure had been only to an adversary from

18  one where the defendant intended to offer testimony at trial,

19  explaining that: "The government is in no way worse off as the

20  result of its receipt of Doe's letter...It does not run the

21  risk that some independent decision-maker will accept Doe's

22  representations without the government having adequate

23  opportunity to rebut them." Id. at 305.

24       Here, in contrast, the defendant has not only

25  disclosed the conclusions of the report to the plaintiff, it

1BNLMARC

did so under circumstances where the results became part of a

critical meeting as to which there will be testimony at trial,

and it also intends to put these conclusions before the jury.

Fairness dictates that the defendant not be permitted to do so

without allowing the plaintiff to access materials enabling her

to rebut the contentions before the jury.  See, for example,

Bilzerian, 926 F.3d at 1294 (defendant who proposed to testify

about his good faith belief in the legality of his conduct

waived privilege for communications because "the jury would be

entitled to know the basis of his understanding that his

actions were legal"); Bowne of New York City, Inc. v. AmBase

Corp., 150 F.R.D. 465, 488 (S.D.N.Y. 1993)(a party may waive

the privilege "if he asserts a factual claim, the truth of

which can only be assessed by examination of a privileged

communication"); Trudeau v. New York State Consumer Protection

Board, 237 F.R.D. 325, 340 (N.D.N.Y. 2006)("Where a party

contends facts to an adjudicating authority...and then relies

upon the privilege to deprive its adversary of access to the

material that might disprove, impeach, effectively contest,

rebut or undermine the party's contention, such would be

unfair." (internal quotation marks and citations omitted)).

        Thus, because the defendant will refer to the

investigation's conclusions at trial, which conclusions

directly contradict the plaintiff's discrimination claim, the

plaintiff should have the opportunity to examine materials that

1BNLMARC

1    would enable her to impeach or rebut those conclusions.

2    Otherwise, the weight of the investigation's conclusion that

3    there was no discrimination would be before the jury and would

4    go unrefuted.  Such a result cannot be squared with the

5    considerations of fairness to the party's adversary, see John

6    Doe, 350 F.3d at 302, which constitute the underlying rationale

7    for the at issue waiver.  Moreover, if the results of the

8    investigation were in fact unfounded and the parties who

9    received those results at Ropes & Gray knew them to be so, that

10   would certainly affect the plaintiff's ability to prove its

11   case of retaliation against the defendant.  Accordingly, the

12   defendant has waived the attorney-client privilege and the work

13   product doctrine by placing the results of the investigation at

14   issue in this litigation.

15           The defendant argues that even if the privileges are

16   deemed waived or forfeited as to some documents related to the

17   investigation, such waiver could only extend to the executive

18   summary of the investigation report detailing the

19   investigation's conclusions and should not include drafts of

20   the report or notes and communications concerning the

21   investigation.  However, for the same reasons that fairness

22   requires waiver of the privilege, it also requires disclosure

23   of the entire investigation report and drafts thereof, as well

24   as notes and communications in connection with the

25   investigation in the possession of Ropes & Gray.  Without the

1BNLMARC

opportunity to examine these documents, the plaintiff would
have no ability to rebut the report's conclusions by, for
example, demonstrating that O'Melveny did not consider all of
the relevant evidence or drew erroneous conclusions from the
evidence it considered.  As a result, the weight of the
investigation's conclusion that no discrimination occurred
would remain before the jury unrefuted, which would be contrary
to the principles of fairness that require waiver in the first
place.  The limit of fairness is not to show that at the
meeting the Ropes & Gray partners accurately reflected the
conclusion of the investigative report.  Fairness requires an
exploration of whether that conclusion was a conclusion that
can be impeached.

        Indeed, the fairness doctrine typically demands that
"testimony as to part of a privileged communication requires
production of the remainder," Von Bulow, 828 F.2d at 102, and
courts have required disclosure of not only investigation
reports but also related materials when such disclosure was
necessary to enable the party to rebut contentions advanced by
the party asserting the privilege, see, for example, Angelone,
2011 Westlaw 4473534 at *2 (privilege waived not only for
investigation report itself but also "for any document or
communication considered, prepared, reviewed or relied upon by
the company in creating or issuing the report" to allow
plaintiff to rebut the contention that defendant conducted the

1BNLMARC

1    investigation thoroughly); Pray, 1997 Westlaw 266980 at *1-2

2    (initial communications and other information connected to

3    investigation discoverable to allow plaintiff to rebut

4    contention that investigation was conducted reasonably).  Here,

5    the plaintiff cannot effectively contest the investigation

6    report's conclusion that there was no discrimination without

7    access to underlying materials.

8             The defendant attempts to avoid this conclusion by

9    reiterating its assertion that it is not relying on the

10   investigation to prove its defenses and, therefore, the

11   plaintiff does not require access to documents exploring how

12   the investigation was conducted and the bases for its

13   conclusions.  However, as discussed above, the argument that

14   the defendant is not relying on the investigation is

15   unpersuasive.  The defendant also cites a line of cases

16   concluding that disclosure of one privileged communication did

17   not waive privilege as to undisclosed portions of that same

18   communication or other related privilege documents.  See, for

19   example, Von Bulow, 828 F.2d at 102; Sullivan v. Warminister

20   Township, 274 F.R.D. 147, 154 (E.D. Pa. 2011); In re Vioxx

21   Products Liability Litigation, No. MDL 1657, 2007 Westlaw

22   854251 at *6 (E.D. La March 6, 2007).  However, these cases are

23   inapposite because they involve situations where waiver was

24   allegedly triggered by extrajudicial disclosure rather than by

25   a party placing a privileged communication at issue.  See, for

1BNLMARC

 1  example, Von Bulow, 828 F.2d at 102 (extrajudicial disclosure

 2  through book publication); Sullivan, 274 F.R.D. at 154

 3  (extrajudicial disclosure of report to media before litigation

 4  had even begun); In re Vioxx, 2007 Westlaw 854251 at *6

 5  (extrajudicial disclosure of report to media where withholding

 6  party had not cited, relied upon, or used the report

 7  offensively in the litigation).  In Von Bulow, the Second

 8  Circuit Court of Appeals explicitly distinguished between

 9  extrajudicial disclosure and at issue waiver in concluding that

10  publication of excerpts of communications with a client did not

11  require disclosure of the unpublished portions of these

12  communications.

13       Because the defendant here has stated that it will

14  place evidence related to the investigation's conclusions

15  before the jury, this is not an instance of extrajudicial

16  disclosure for which the scope of the resulting waiver should

17  be limited.  Instead, fairness requires that the plaintiff have

18  access to the drafts, notes, and communications concerning the

19  investigation in the possession of Ropes & Gray so that she

20  will have an opportunity to challenge the conclusions of the

21  investigation that will be before the jury.

22       This is also not a case like Seyler v. T-Systems, 771

23  F. Supp. 2d at 284, (S.D.N.Y. 2011), also relied on by the

24  defendant.  In that case, a single email was produced, although

25  the producing party did not know the email reflected a

1BNLMARC

1   privileged communication.  No waiver was found because the

2   producing party represented it would not use the email.

3          Thus, the plaintiff's motion to compel disclosure of

4   the investigative report and related drafts, notes, and

5   communications in the possession of Ropes & Gray is granted.

6   The Court notes that the request for production at this point

7   concerns documents in the possession of Ropes & Gray.  It is

8   not a fishing expedition into the files of O'Melveny.  If the

9   only affirmative use of the investigation will be limited by

10  Ropes & Gray, then the discovery to impeach its conclusions

11  should also be appropriately focused.  See Federal Rule of

12  Civil Procedure 26(b)(2)(C).  The Court also notes that there

13  may be limits that could be placed on these disclosures based

14  on the need for certain materials or the need for

15  proportionality in discovery.  However, at this point, the

16  defendant has not suggested any such limits or pointed the

17  Court to the burden of producing various kinds of material

18  which might outweigh the role of the O'Melveny investigation in

19  this case.  The Court does not foreclose the possibility that

20  some limits would be required in the future, depending upon the

21  volume of the materials sought by the plaintiff and the

22  remoteness of those materials to the issues in this case, but

23  those limits have not been suggested to the Court at this

24  point.

25          The Court has considered all of the arguments of the

1BNLMARC

1    parties.  To the extent not specifically addressed above, the

2    remaining arguments are either moot or without merit.  For the

3    reasons explained above, the plaintiff's motion to compel is

4    granted.  The clerk is directed to close docket No. 17.

5         All right.  Now, I said I would take up some discovery

6    issues with you because I've been reading with interest the

7    correspondence that you've sent to me.  It's distressing.

8         Let me just make some observations in connection with

9    the O'Melveny investigation.  In the course of the argument and

10   in the course of the decision, I indicated that there should be

11   limits based on proportionality and the role of the O'Melveny

12   investigation at the trial.  It's clear to me listening to the

13   parties that the defendant is placing before the jury the

14   O'Melveny investigation and the plaintiff, therefore, should

15   have a reasonable opportunity to respond to that and to explain

16   to the jury why they shouldn't credit the O'Melveny

17   investigation, and it's part of the evidence that defendant

18   wishes to introduce.

19        At the same time, the defendant says it's not going to

20   rely so much on the O'Melveny investigation and it's going to

21   prove no discrimination and plaintiff is going to attempt to

22   prove discrimination and the defendant says no retaliation and

23   the plaintiff will attempt to prove retaliation.  There will

24   obviously be limits in terms of time that you all are given for

25   trial and you all are preparing the case to try it or to settle

1BNLMARC

1  it.  And from what I've heard, no one intends to spend a lot of

2  time on having a trial within a trial on the O'Melveny

3  investigation.

4          But, at the same time, it would appear to me -- and

5  this is not fully briefed before me -- but the most critical

6  parts of the O'Melveny investigation would be the O'Melveny

7  report, the drafts of the executive summary, the drafts of the

8  report, and was there any interference in the course of

9  preparing the report to suggest that the report was not an

10  independent report.  So, those are important materials.

11          But is it necessary to redo all of the O'Melveny

12  interviews and to get the O'Melveny lawyers in as to what they

13  did and how they conducted the interviews?  I haven't been

14  persuaded on that by the papers.  And I expect that the parties

15  will conduct the litigation with a sufficient awareness of

16  getting the case ready for settlement or trial and with a view

17  toward what reasonable documents, for example, could be

18  presented at trial.  It's not going to be thousands.  And I

19  don't expect that the lawyers are going to be seeking through

20  haystacks to find missing needles.

21          And I expect the discovery to be proportional to

22  what's at stake, including with respect to the individual

23  issues, which then leads me to the next issue.  Having read the

24  discovery correspondence, there are certain obviously critical

25  pieces of information to which, for example, the plaintiff is

1BNLMARC

1    entitled.  The plaintiff is entitled to evidence about what

2    happened to allegedly similar comparators, and the fact that

3    this is sensitive information that the defendants don't want to

4    produce is not an argument that the plaintiff, under the cases,

5    has no ability to show that she was treated differently from

6    allegedly similarly situated people.

7         Obviously, this is not all developed in the papers.

8    All I have is the plaintiff's request, okay, let us make a

9    motion to compel.  And the defendant says no, it's not ripe

10   yet, we can still talk about it.  At the end of the day I would

11   have thought that the parties are going to say to each other,

12   hopefully, the judge is going to make us produce reasonable

13   proportional discovery.  We can decide between ourselves what

14   is reasonable and proportional discovery.  We don't have to

15   come in and present ourselves to the Court and look

16   unreasonable.  And you would think to yourself that you -- both

17   sides would say we don't want to present a dispute to the Court

18   that we know we're going to lose on.

19        And if either side wants me to have another conference

20   with you and with your clients to make that exact point, we'll

21   have another conference.  You're certainly welcome to get the

22   transcript.

23        There's a confidentiality order in the case.  If we

24   need a stricter confidentiality order, we'll get a stricter

25   confidentiality order.  I don't know of any reason why what is

1BNLMARC

 1   quintessentially important relevant evidence, not just

 2   peripheral evidence, but was the plaintiff treated the same way

 3   as others who are fair comparators -- now, there may be an

 4   issue about what are fair comparators and, okay, the parties

 5   can explain that to me.  But at the end of the day, you know

 6   what the answer is going to be on that piece of discovery.

 7          Second, there's a reference in the papers that the

 8   defendant has relied on the plaintiff's billing records in

 9   order to establish that the plaintiff was not a sufficient

10   producer and that that was one of the reasons for the

11   plaintiff's termination.  But at least the papers say when

12   asked for the billing records, the defendant says we're not

13   going to give them to you because those reveal privileged

14   material.  That may not be, but it's just the allegation in the

15   papers.

16          So, reasonable lawyers on both sides would say we

17   can't rely on records that we don't give to the other side.  We

18   can work out some way to amend the records, redact the records

19   to eliminate privileged material, if necessary.  If you need a

20   court order that says no waiver, this is required, you can get

21   a court order.  And that's the second thing that sort of jumps

22   out from the correspondence.

23          The third thing that jumps out from the correspondence

24   is sort of pattern discovery responses which say, you know, we

25   object to this request for all of our general objections and

1BNLMARC

1    we'll look for the records and give you the reference if we

2    find any and, you know, at the end of the day, after you've had

3    your meet and confer, there will be an answer.  Are there

4    documents being sought that are really being objected to?  If

5    they're reasonable to be produced, if they're reasonable in

6    terms of the issues, if they're proportional, then they're

7    going to be produced.  If they're burdensome, overbroad, not a

8    general objection but a specific objection with respect to how

9    burdensome individual documents are, then if they're not

10   sufficiently important and if their value is outweighed by the

11   burden of producing them, then they won't be produced.

12          And you all know that.  You can exchange mail with

13   each other in which you object to each other's discovery

14   requests and you can have your meet and confer.  I'm not going

15   to say you can make a discovery motion at this point because I

16   don't think that the issues have been sufficiently gelled.  And

17   I will have, if you tell me, Judge, we have some discovery

18   issues which we can't resolve, I will attempt to decide them

19   myself, not give them to the magistrate judge because I really

20   want to find out.  I want to have a better sense of who's being

21   reasonable and who's not being reasonable.

22          I'm plainly going to have to decide other motions in

23   this case.  I think the credibility of lawyers is very

24   important.  And I think if I simply send this to the magistrate

25   judge, which this correspondence is a plain invitation to do,

1BNLMARC

1    parties are more willing to make arguments before the

2    magistrate judge than they are before me.  It just happens.

3    There may be a point where I send you to the magistrate judge,

4    but if I do, that's not a good sign, not a good sign.

5            So, where do you go from here?  Well, I've already

6    indicated to you that there are some issues that seem to me

7    that cry out for immediate resolution because we've talked

8    about them before.  Comparators is one.  And if you have

9    legitimate discovery disputes which you've been unable to work

10   out, then you have to send me a letter laying out what the

11   discovery disputes are and then there has to be a responsive

12   letter and I will call you in for a conference to see if I can

13   dispose of the discovery issues.

14           My obvious hope is that reasonable people will not be

15   back before me on discovery disputes because between you, you

16   should be able to know whether your respective positions are

17   reasonable or not.  And if the discovery sought is in fact

18   reasonable and proportional, then it should be given.  And if

19   it's not, then it shouldn't be.  And if you have a dispute, you

20   can write me the letter and lay out the dispute, letter in

21   response, and I'll call you in for a prompt conference.

22           Anything else that I can help you with today, specific

23   issues?

24           MS. VLADECK:  No, your Honor.  Thank you.

25           MS. PLEVAN:  Well, first of all, well, I think

1BNLMARC

1     Ms. Vladeck and I had a conversation the other day about timing

2     of the discovery, and I think that is at least a ripe issue to

3     bring to your attention that I don't see how we can possibly

4     complete discovery in the time period that's been allotted.

5     And I think the truncated or what has become a truncated time

6     and the difficulty of witnesses being available -- we haven't

7     been able to schedule the second day of Ms. Martone.   In

8     addition to our schedules, our clients are flying all over the

9     world on business.

10              THE COURT:  The parties haven't asked me for an

11     extension of the discovery deadline in this case.

12              MS. VLADECK:  That's correct.

13              MS. PLEVAN:  We have not.

14              THE COURT:  And I appreciate that.  And I've assumed

15     that you were acting cooperatively in an effort to conduct the

16     discovery, finish the discovery in the time that you had

17     originally undertaken to do it.  And unlike some districts, I'm

18     not so opposed to a first request for an extension of discovery

19     when lawyers are acting reasonably with each other, so.

20              MS. PLEVAN:  I mean I think we would like to talk

21     further and make a proposal to you next week.

22              THE COURT:  That's fine.

23              MS. PLEVAN:  But there has been one day of

24     Ms. Martone's deposition and four other depositions and a fifth

25     that will take place next week that the plaintiff is taking.

1BNLMARC

1    And I think just to add to that, there have been tens of

2    thousands of documents and emails produced in this case by the

3    defendant.

4         And the only other point, I think we take to heart

5    your comments and it is the reason that I said what I said in

6    my letter that I didn't think this issue was ripe.  We did have

7    a challenge, do have a challenge in dealing with this

8    comparator issue as to people who might have been candidates

9    for departure or did depart the firm because -- I don't want to

10   lay on our problems, but the people that are helping us at the

11   firm are not privy to that information and we have not been in

12   a position to actually obtain the information until a few days

13   ago and now I think are in a position to formulate a more

14   specific proposal which may or may not be, you know, something

15   we can reach agreement on.  But I think we will at least be

16   able to make progress on that issue and, obviously, we'll keep

17   talking about the other issues as well.

18        THE COURT:  Is this a case where you're going to have

19   expert discovery?

20        MS. PLEVAN:  I don't think so, your Honor.

21        MS. VLADECK:  I don't think so either, your Honor.

22        THE COURT:  Wonderful.  Do you have any idea about

23   what your thoughts are about the -- I don't want to ask you to

24   commit to the discovery cutoff now.  The fact that you don't

25   have to factor in expert discovery is very useful.

1BNLMARC

1          MS. PLEVAN:  Well, it will mean we don't have to have

2     additional time for that.

3          THE COURT:  Right.

4          MS. PLEVAN:  And we haven't talked at all about a

5     specific time frame, and I think I need to consult with our

6     folks too.  We're basically December 15 is the date now and

7     extending it, you know, the rest of December is not likely to

8     help us advance much in this deposition schedule.

9          THE COURT:  I understand.  And, you know, if it's

10    December 15, I wouldn't say, gee, you've got to finish it by

11    the end of December or even January 15.  I mean I want to be --

12         MS. PLEVAN:  I was going to say I know in particular

13    that one of the depositions that we are having a lot of

14    difficulty scheduling is Mr. Malt, and the first two weeks in

15    January are I know for sure impossible for him as well as the

16    last two weeks in December because that's their compensation

17    period.  So we were fortunate to be able to get Mr. Montgomery

18    in next week.  But I really need to find out more about -- so I

19    think it would at least be the end of January, but I need to

20    find out for sure that he's not in Hong Kong that week, so.

21         THE COURT:  Okay.  Is this a case where there are

22    going to be any dispositive motions?

23         MS. PLEVAN:  I would think so, your Honor, yes.

24         MS. VLADECK:  I would think there shouldn't be, your

25    Honor, but I will argue that at the time.  I think the

1BNLMARC

1   discovery so far would suggest that there shouldn't be

2   dispositive motions.

3           THE COURT:  Okay.  One thing which I don't want to do

4   is -- I'm aware that you've been diligently pursuing a first

5   discovery cutoff, which is great, and that there are holidays

6   coming up.  And one advantage obviously of a discovery cutoff

7   is you conduct all the discovery that's reasonable within the

8   time limit that's imposed.  The fact that I extend the

9   discovery cutoff shouldn't be an invitation to conduct lots of

10  other discovery.  If I had kept the December 15 deadline for

11  the conclusion of discovery, the amount of discovery on the

12  O'Melveny investigation would be remarkably truncated.  It

13  would be.

14          MS. VLADECK:  I agree, your Honor.

15          THE COURT:  And so the fact that I extend or I'm

16  inclined to extend the deadline shouldn't be an invitation to

17  conduct the trial within a trial that I've talked about.

18          MS. VLADECK:  Understood.

19          THE COURT:  Okay.  Anything else?

20          MS. PLEVAN:  No, your Honor.

21          MS. VLADECK:  No, your Honor.  Thank you.

22          THE COURT:  Good afternoon all.  Good to see you all.

23                         o0o

24

25